**THE UNITED STATED DISTRICT COURT**
**FOR THE NORTHERN ILLINOIS DISTRICT**
**EASTERN DIVISION**

| | |
|---|---|
| VINCENT MACINO,<br>PLAINTIFF,<br><br>v.<br><br>EQUIP HEALTH MEDICAL, P.C., a California Professional Corporation, and EQUIP HEALTH MEDICAL COLORADO, P.C., a Colorado Professional Corporation,<br>DEFENDANTS. | Case No.:<br><br>AMOUNT DEMANDED IN EXCESS OF $75,000.00. |

## COMPLAINT

Plaintiff Vincent Macino, by and through his attorney Nicholas Kreitman of Kreitman Law, LLC, brings this Complaint against Defendants Equip Health Medical, P.C. (Defendant Equip) and Equip Health Medical Colorado PC ("Defendant Equip CO") and states as follows:

## INTRODUCTION

1. Plaintiff Vincent Macino is an Illinois licensed Physician Assistant who started employment with Defendant Equip on or about October 15, 2024, pursuant to a California choice of law provision agreement, to provide telehealth services to patients with eating disorders and whose employment was subsequently transferred May 1, 2025, to Defendant Equip CO. From the outset of his employment, Mr. Macino discovered that Defendant Equip required its providers to treat patients in states where the providers were not licensed, in what he reasonably believed to be in violation of state licensing laws. When Mr. Macino raised good faith concerns about these practices at both Defendants, and when he raised concerns about Defendants' removal of admission screening criteria that resulted in the acceptance of critically ill patients into a program incapable of providing appropriate care, Defendants subjected him to escalating retaliation, including assignment of unreasonable workloads, assignment of additional state licenses without consultation, denial of

necessary administrative support for licensing tasks, verbal warnings to cease expressing dissenting views, and ultimately termination. Mr. Macino's termination occurred just six days after he formally reported retaliatory conduct to Human Resources. Throughout his employment, Mr. Macino consistently met or exceeded all performance metrics and never received any formal discipline or negative feedback regarding his clinical care.

**PARTIES, JURISDICTION AND VENUE**

2. Plaintiff Vincent Macino is a citizen of Illinois and resident of this judicial district.

3. Defendant Equip is a citizen of the State of California and is California professional corporation with its principal place of business at 2659 State Street, Suite 100, Carlsbad, CA 92008, as registered with the California Secretary of State.

4. Defendant Equip CO is a citizen of the State of Colorado and is a Colorado professional corporation with its principal place of business at 1312 17th St PMB 1235 Denver CO 80202, as registered with the Colorado Secretary of State.

5. At the time of his termination, Plaintiff's base salary was $130,000 per year plus the opportunity to earn a 15% performance bonus. Together with other compensatory damages, punitive damages, and statutory penalties available under the Illinois Whistleblower Act and/or common law retaliatory discharge, the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in Illinois and as Defendants each transact business in Illinois.

## FACTUAL ALLEGATIONS

### I. Plaintiff's Employment and Initial Concerns

8. On or about August 12, 2024, Defendant Equip sent Plaintiff Vincent an offer letter of employment.

9. A term of this offer letter was a choice of law provision which stated as follows:

> Governing Law. The validity, interpretation, construction and performance of this letter, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of California, without giving effect to principles of conflicts of law.

10. On or before August 15, 2025, Plaintiff signed acceptance of the offer letter

11. Thereafter, on or about October 15, 2024, Plaintiff Vincent Macino began employment with Defendant Equip as a Physician Assistant to provide telehealth services to patients with eating disorders working remotely from his home in Illinois.

12. At the time of his hire, Plaintiff was licensed to practice as a Physician Assistant in Illinois and California.

13. Plaintiff's base annual salary was $130,000, with the opportunity to earn an additional 15% performance bonus.

14. Within approximately one month of starting employment, Plaintiff discovered that Defendant Equip had assigned him a substantial number of patients who were located in states where Plaintiff was not yet licensed to practice.

15. Plaintiff clearly recalled from his Physician Assistant education that providers are prohibited from treating patients in states where they are not licensed.

16. Plaintiff had begun the process of obtaining additional state licenses but had not yet completed the licensing process for many states where Defendant Equip had assigned him patients.

## II. Plaintiff Raises Concerns to Compliance Leadership

17. In or around November 2024, Plaintiff raised concerns to his immediate supervisor, Heather Karpey, NP, and to his supervising physician, Amy Rapaport, MD, explaining that he wanted to help the organization but had concerns about liability and legal issues related to treating patients in states where he was not licensed.

18. Ms. Karpey and Dr. Rapaport directed Plaintiff to meet with Molly Menton, Vice President of Quality & Compliance, to address his concerns.

19. During his meeting with Ms. Menton, Plaintiff explained his concerns about treating patients in states where he was not licensed.

20. Ms. Menton told Plaintiff that Defendant Equip had "three levels of protection" for providers, including having a supervising physician licensed in the state where patients were located, and that Defendant Equip's legal team had spent "countless hours" researching the licensing issues.

21. Prior to his meeting with Ms. Menton, Plaintiff had independently contacted and emailed several state Physician Assistant licensing boards to research the legal requirements.

22. Plaintiff shared with Ms. Menton that he had received guidance from state licensing boards advising against the practice of treating patients in states where the provider is not licensed.

23. On or about October 23, 2024, the Minnesota Board of Medical Practice advised Plaintiff via email: "Until you have an active medical license, the physician would need to see the patient as well. It isn't enough for them just to attest the documentation."

24. When Plaintiff shared this guidance with Ms. Menton, she dismissed it, stating that state licensing board staff members were "undereducated" and again emphasized the work Defendant Equip's legal team had done to justify Defendant Equip's practices.

25. Plaintiff asked Ms. Menton why, if the practice was "totally legal," Defendant Equip's compliance materials included a statement indicating that if a provider chose not to see a patient in a state where they were not licensed, Defendant Equip would honor that request and would not retaliate.

26. Ms. Menton responded that if Defendant Equip wanted to terminate someone, the policy existed to "protect their butts."

**III. Removal of Admission Criteria and Patient Safety Concerns**

27. In or around March 2025, Defendant Equip removed its admission screening criteria for new patients.

28. Prior to the removal of admission criteria, Defendant Equip had maintained screening standards designed to ensure that admitted patients were appropriate for Defendant Equip's level of care and to protect both patients and providers.

29. Following the removal of admission criteria, Defendant Equip began accepting increasingly medically complex, severely ill, and high-risk patients into its eating disorder treatment program.

30. Some of the patients being admitted to Defendant Equip's program required a higher level of care than Defendant Equip's telehealth model could safely provide.

31. Defendant Equip's removal of admission criteria was part of its "provide care for all" policy, which prioritized revenue and patient volume over patient safety and clinical appropriateness.

32. The removal of admission criteria substantially increased the danger to patients by admitting individuals whose medical needs exceeded what Defendant Equip's program could safely manage.

33. Providers, including Plaintiff, began expressing concerns that critically ill patients should be medically discharged to higher levels of care rather than admitted to or maintained in Defendant Equip's program.

34. Despite these safety concerns, Defendant Equip implemented financial incentives that discouraged providers from discharging medically inappropriate patients to higher levels of care.

35. Defendant Equip tied provider bonuses to keeping patients in service for a minimum of sixteen weeks, which created a financial incentive to retain patients who should have been transferred to more intensive treatment settings.

36. This bonus structure directly created safety issues for patients who needed higher levels of care but were retained in Defendant Equip's program due to the financial incentives.

37. Defendant Equip also tied provider bonuses to a "trust your village" Key Performance Indicator, which essentially meant that providers should not express concerns or ask questions that could be perceived as opposing viewpoints to Defendant Equip's treatment model.

38. This KPI further discouraged providers from raising legitimate patient safety concerns or advocating for appropriate care levels.

## IV. Formal Complaints to Legal Department and Leadership

39. In or around March 2025, while completing a licensing examination for the State of Texas, Plaintiff encountered a test question that reinforced his concerns about the illegality of Defendant Equip's licensing practices.

40. The test question asked whether a Physician Assistant whose license had expired by one day could see patients in clinic. The correct answer was "False."

41. During a Medical/Psychiatry team meeting where Janice Tam from Defendant Equip's Legal Department was present, Plaintiff again raised questions about the legality of treating patients in states where providers were not fully licensed.

42. Ms. Tam asked Plaintiff to email her for follow-up, which Plaintiff did on or about March 26, 2025.

43. On or about March 20, 2025, Plaintiff raised concerns with Dr. Rapaport about both the licensing issues and the removal of pre-screening criteria for high-risk patients.

44. Rather than address Plaintiff's concerns, Dr. Rapaport told Plaintiff to quit if he found any part of the job objectionable.

45. On or about March 25, 2025, Plaintiff emailed Kelly Watton, NP, a colleague, voicing concerns about being pressured to treat patients in states where he was unlicensed and the ethical risks of admitting severely ill patients into a care model Defendant Equipped to support them.

## V. March 27, 2025 Email to Leadership

46. On or about March 27, 2025, Plaintiff sent a formal email to Dr. Rapaport, Ms. Menton, Ms. Karpey, Ms. Tam, Candace Kohl Dale (Senior Vice President of Care Operations and Care Experience), and Emilee Rojas (Senior Medical Services Manager).

47. The email was titled "Adjustment to Credentialing and Patient Intake Capacity."

48. In the email, Plaintiff described his reasonable and good faith concerns about the illegality and liability potential related to Defendant Equip's licensing model and the dangers of removing patient screening criteria that had previously protected both providers and patients.

49. Plaintiff explained that the practices violated state licensing laws and posed substantial risks to patient safety.

50. Plaintiff expressed concerns about the removal of admission criteria and the admission of critically ill patients whose medical complexity and risk exceeded what Defendant Equip's telehealth eating disorder program could safely manage.

51. Plaintiff expressed concerns about provider liability for treating medically inappropriate patients in a setting that lacked the resources and structure to provide adequate care.

52. Plaintiff expressed his good faith belief that Defendant Equip's practices violated state and federal laws, rules, and regulations governing healthcare licensure and posed a substantial and specific danger to public health and patient safety.

53. The recipients of the email did not acknowledge the legal validity of Plaintiff's concerns.

54. However, immediately following Plaintiff's March 27, 2025 email, Defendant Equip removed all out-of-state patients from Plaintiff's caseload, thereby tacitly confirming the problem Plaintiff had identified.

55. Defendant Equip's immediate action to remove unlicensed-state patients from Plaintiff's caseload demonstrated that Defendant Equip was aware of the illegality of its licensing practices.

56. After Plaintiff's March 27, 2025 email, the entire department changed its standard practices, and all providers' patients in states where the providers were not licensed were transferred to other providers.

57. This company-wide policy change confirmed that Plaintiff's concerns were well-founded and that Defendant Equip had been aware of the illegality of its prior practices.

**VI. Retaliation Begins and Escalates**

58. Following Plaintiff's March 27, 2025 email raising concerns about illegal practices and patient safety, Defendant Equip began a campaign of retaliation against Plaintiff.

59. Defendant Equip doubled Plaintiff's workload.

60. On or about April 3, 2025, Plaintiff noted in his one-on-one meeting document with supervisors: "Noticed the 37 new transfers that were from Sarah to me jumped up to 65 and assigned 9 brand new pt's in 1 day- retaliation?"

61. The sudden and dramatic increase in Plaintiff's caseload occurred immediately after his protected disclosures and constituted an unreasonable and punitive workload designed to retaliate against him for raising legal and safety concerns.

62. When Plaintiff asked Ms. Tam from the Legal Department what the outcome of her investigation was, she directed Plaintiff's inquiry to Ms. Menton, who provided a generic response and never stated whether there were legal issues with the practices that she, Dr. Rapaport, and Ms. Karpey had previously directed Plaintiff to engage in.

63. In or around March 2025, Defendant Equip assigned Plaintiff five additional state licenses without consultation or discussion with Plaintiff.

64. Plaintiff raised the issue of these additional license assignments with Dr. Rapaport on one occasion, but Dr. Rapaport did not respond and changed the subject.

65. These additional licensing assignments were made in retaliation for Plaintiff's protected disclosures and were designed to burden Plaintiff with additional administrative work.

66. Following Plaintiff's March 27, 2025 email, Dr. Rapaport ceased responding to Plaintiff's communications regarding licensing matters.

67. On or about February 27, 2025, Plaintiff had set an annual performance goal with supervisor Heather Karpey tied to annual reviews and bonuses. The goal, as documented in the one-on-one meeting notes, was: "Keeping up with all of my Medallion (licensing) tasks in an effort to obtain as many licenses as possible by the end of the quarter. Linked to: Expanding access to pt care."

68. Dr. Rapaport's responsibilities included completing certain administrative forms necessary for Plaintiff to obtain state licenses.

69. Dr. Rapaport's failure to timely complete the required licensing forms directly resulted in Plaintiff losing his pending Mississippi license application because the deadline passed before Dr. Rapaport submitted the necessary documentation.

**VII. Plaintiff Raises Concerns About Patient Safety**

70. On or about April 10, 2025, Plaintiff raised patient safety concerns with Maria La Via, MD, Defendant's backup supervising physician, in his one-on-one meeting document.

71. Plaintiff expressed concerns about providing medical care to Defendant's sickest patients whose medical complexity and acuity exceeded what Defendant's program could safely manage.

72. Dr. La Via responded by suggesting that Plaintiff approach care for these critically ill patients as a "palliative care approach."

73. Defendants are not palliative care companies and does not provide palliative care services.

74. Dr. La Via's response demonstrated that Defendant's supervising physicians were aware that patients being admitted to Defendant's program were critically ill and medically inappropriate for the level of care Defendant provided, yet Defendant continued to accept and retain these patients.

75. Plaintiff's supervisor, Ms. Karpey, on multiple occasions referred to Defendants' treatment model as providing an "illusion of care," acknowledging that Defendants' program created the appearance of adequate treatment while lacking the capacity to provide it. Dr. La Via also used the phrase "illusion of care" during a one-on-one meeting with Plaintiff when discussing the palliative care approach to patients whose medical needs exceeded what Defendants' program could safely manage.

76. Between February and April 2025, Defendant scheduled multiple patient intake appointments in Plaintiff's follow-up appointment slots, reducing his ability to provide continuity of care and degrading patient safety.

77. During the week of March 24, 2025, Defendant scheduled ten intake appointments for Plaintiff.

78. Seven of those intake appointments were scheduled during a week when Plaintiff was scheduled to be on paid time off.

79. On or about April 3, 2025, Plaintiff brought his concerns about retaliation to Ms. Karpey, who dismissed his complaints without taking action.

80. On or about April 24, 2025, during a one-on-one conversation with Ms. Karpey, Plaintiff noted that numerous providers had quit around the time he started, including one supervising physician who had been on the leadership team and with whom Plaintiff had originally interviewed.

81. The departure of multiple providers, including a supervising physician from the leadership team, reflected the severity of concerns about Defendant's practices.

82. On May 1, 2025, Plaintiff's employment was unilaterally transferred from Defendant Equip to Defendant Equip CO., with no changes in his reporting structure, compensation, workload, job titles, management, supervisors, or job responsibilities or duties.

83. On or about May 6, 2025, Plaintiff documented in his one-on-one meeting notes that numerous team members in weekly huddles across all verticals—including Therapy, Registered Dietitians, Peer Supports, and Family Supports—had all expressed concerns about patient safety relating to the removal of admission criteria and Defendant Equip – now Defendant Equip CO's refusal to medically discharge patients to higher levels of care.

84. These widespread concerns across multiple disciplines confirmed that the patient safety issues Plaintiff raised were not isolated complaints but reflected systemic problems recognized throughout Defendants' organization.

85. On or about May 8, 2025, Dr. Rapaport issued a verbal coaching to Plaintiff.

86. During this coaching, Dr. Rapaport warned Plaintiff not to express anything "negative" or that opposed Defendant's model in team huddles or in patient charts.

87. Dr. Rapaport specifically instructed Plaintiff that he should not indicate in patient charts or team meetings that a patient should be in a higher level of care and not admitted to Defendant's program due to medical risk, morbidity, or mortality concerns.

88. Dr. Rapaport stated that Defendants' mission would not change, that the company would continue to 'provide care for all,' and that any additional concerns or views not '100% aligned with Equip's values' should be raised only in one-on-one evaluations with supervisors.

89. Dr. Rapaport told Plaintiff it was acceptable to have different views and express concerns but not to do so publicly in team meetings or on Slack.

90. Dr. Rapaport's instructions were designed to suppress Plaintiff's ability to advocate for patient safety and appropriate levels of care.

91. Following the verbal coaching, Plaintiff sent Dr. Rapaport a follow-up email requesting that she provide him with a written summary of what she had said for clarification and to allow him to ask follow-up questions.

92. In her written response on or about May 15, 2025, Dr. Rapaport omitted the restrictions she had clearly articulated verbally, particularly the instructions to keep his views to himself and not express them on Slack or in group meetings.

93. Plaintiff documented Dr. Rapaport's verbal statements and her written response in his one-on-one meeting document dated May 8, 2025 and May 15, 2025.

On or about May 19, 2025, Plaintiff sent a follow-up email to Dr. Rapaport attempting to get the licensing tasks completed, but he was unable to locate Dr. Rapaport's response or subsequent responses.

94. Plaintiff was unable to obtain licenses in several other states, including Texas and Arkansas, due to delays in Dr. Rapaport's responses, despite Plaintiff having completed all tasks on his end.

95. Dr. Rapaport's failure to complete her administrative responsibilities directly impacted Plaintiff's ability to meet his annual review goals, which were tied to his compensation and performance evaluation.

96. On or about June 12, 2025, Plaintiff contacted Alex Hershiser, People Operations Manager in Defendant's Human Resources department, to express his concerns that he was being retaliated against by Dr. Rapaport.

97. Plaintiff provided details about the retaliation he had experienced, including the excessive workload, the failure to complete licensing tasks, and the instructions to suppress his views on patient safety.

98. That same day, June 12, 2025, Plaintiff formally told Dr. Rapaport that he was concerned she was retaliating against him by delaying on administrative tasks necessary for him to obtain licensing and be approving excessive intake load for new patients that were unreasonable compared to standard practices and interfered with his ability to provide appropriate follow-up care to existing patients.

99. On or about July 3, 2025, Plaintiff emailed Ms. Karpey about how the overload of intake appointments interfered with his ability to provide quality care.

100. On or about July 3, 2025, Plaintiff met with Andy Meyers, Manager of People Success, to formally report that he was being retaliated against for his protected activities.

101. During the meeting, Plaintiff explained that he was being retaliated against for refusing to treat patients in states where he was unlicensed, for objecting to the deterioration in safety standards, and for expressing concerns regarding Dr. Rapaport's retaliatory behavior.

102. Plaintiff reiterated the ethical and legal issues stemming from Defendants' removal of intake screening criteria.

103. Plaintiff explained that Defendants' removal of admission criteria resulted in the admission of critically ill patients whose medical needs exceeded what Defendant's program could safely provide.

104. Plaintiff explained that the excessive intake load had eroded his ability to provide appropriate follow-up care to patients.

105. Plaintiff emphasized that his concerns about Defendant's practices were based on his good faith belief that Defendant's policies and practices violated state licensing laws and posed substantial and specific dangers to patient safety and public health.

106. Mr. Meyers committed to looking into the matter and following up with Plaintiff.

107. At the end of the call, Plaintiff specifically requested that Mr. Meyers send him an email with a summary of what they discussed so that Plaintiff could understand what Mr. Meyers took away from the conversation.

108. Plaintiff also requested that they schedule a follow-up meeting so Mr. Meyers could ask additional questions and they could work together to build a path forward with improved communication and working conditions under Dr. Rapaport.

109. Mr. Meyers never followed up with Plaintiff as promised.

110. Mr. Meyers never sent the requested email summary.

111. Mr. Meyers never scheduled a follow-up meeting with Plaintiff.

112. Defendants' took no action to investigate or address Plaintiff's complaints of retaliation.

113. On July 9, 2025, just six days after Plaintiff's formal report of retaliation to Mr. Meyers, Defendant Equip CO terminated Plaintiff's employment.

114. The termination meeting was conducted by Brooke Harris, Senior Director of People Success, and Heather Karpey, Plaintiff's supervisor.

115. During the termination meeting, Ms. Harris and Ms. Karpey told Plaintiff to the effect of 'You've told us that you are not happy here and that you don't agree with our treatment philosophy and care model. While we respect that you do not align with our treatment model and appreciate that you have always spoken your mind, it is a fundamental part of you doing your job... We are terminating you effective immediately.... it is our standard practice as we don't want you doing any more work for the company.'

116. This stated reason for termination was false and pretextual.

117. Plaintiff never told Defendants that he was "unhappy" with his employment.

118. Plaintiff's stated concerns with Defendants' 'treatment philosophy and care model' were specifically related to the removal of admission criteria that resulted in accepting critically ill patients inappropriate for Defendants' level of care, the financial incentives that discouraged appropriate discharge to higher levels of care, and the requirement to treat patients in states where he was not licensed in violation of law.

119. Plaintiff's only stated disagreement with Defendants' practices was his refusal to engage in conduct that violated state licensing laws and endangered patients.

120. Plaintiff's concerns were based on well-founded legal and ethical obligations, not mere disagreement with business practices.

121. Plaintiff had never received any formal performance warning, write-up, performance improvement plan, or any indication that his clinical care or conduct was deficient.

## COUNT I
## RETALIATION IN VIOLATION OF CALIFORNIA LABOR CODE § 1102.5(b)
## (Against Defendant Equip Health Medical, P.C.)

122. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

123. At all times relevant to this Count, Defendant Equip was an "employer" within the meaning of California Labor Code Section 1132.2, which defines "employer" as "every person, including a corporation, a limited liability company, a trust, a partnership, a proprietorship, or an association, engaged in any business or enterprise in this state, who has one or more persons in service under any appointment, contract of hire, or apprenticeship, express or implied, oral or written."

124. At all times relevant to this Count, Plaintiff Vincent Macino was an "employee" of Defendant Equip within the meaning of California Labor Code Section 1132.4, which defines "employee" to include "every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written."

125. Defendant Equip expressly agreed to waive any defenses based on extraterritorial application of California law and/or coverage under California law through operation of the choice of law provision contained in Plaintiff's employment agreement with Defendant Equip, which provided that California law would govern all disputes arising from Plaintiff's employment. Defendant Equip should be estopped from asserting any such defenses.

126. California Labor Code Section 1102.5(b) provides that "[a]n employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation,

hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

127. By virtue of Section 1102.5(b), Defendant Equip owed Plaintiff a statutory duty not to retaliate against him for disclosing information to persons with authority over him or other employees who had the authority to investigate, discover, or correct violations or noncompliance, when Plaintiff had reasonable cause to believe that the information disclosed violations of state or federal statutes or violations of or noncompliance with state or federal rules or regulations.

128. Beginning in or around November 2024 and continuing through April 30, 2025, Plaintiff made multiple protected disclosures to Defendant Equip's supervisors, compliance personnel, and legal department of practices Plaintiff reasonably believed to be violations of state and federal law.

a. On or about October 15, 2024, during his orientation period, Plaintiff discovered that Defendant Equip had assigned him patients located in states where he was not licensed to practice medicine, in violation of state medical practice acts and telehealth licensure requirements. Plaintiff raised these concerns to his supervisor, Heather Karpey, NP, and to his supervising physician, Amy Rapaport, MD.

b. In or around November 2024, Plaintiff disclosed to Molly Menton, Vice President of Quality and Compliance, that Defendant Equip was assigning him to treat patients in states where he was not licensed, in violation of state medical licensing laws and patient safety standards. Plaintiff informed Ms. Menton that he had contacted state licensing boards, including the Minnesota Board of Medical Practice, to inquire about the legality of these practices.

c. On or about October 23, 2024, Plaintiff received guidance from the Minnesota Board of Medical Practice via email stating: "Until you have an active medical license, the physician would need to see the patient as well. It isn't enough for them just to attest the documentation." Plaintiff forwarded this guidance to Defendant Equip's leadership and legal department.

d. On or about March 26, 2025, during a Med/Psych team meeting attended by Janice Tam from Defendant Equip's Legal Department, Plaintiff again raised concerns about

the legality of practicing in states where he was not fully licensed. Ms. Tam requested that Plaintiff follow up with her by email, which he did on March 26, 2025.

e. On or about March 20, 2025, Plaintiff raised concerns to Dr. Amy Rapaport about licensure issues and the removal of pre-screening criteria for high-risk patients, which created patient safety risks and exposed providers to liability.

f. On or about March 25, 2025, Plaintiff emailed Kelly Watton, NP, voicing concerns about being pressured to treat patients in states where he was unlicensed and the ethical risks of admitting severely ill patients into a care model unequipped to support them.

g. On or about March 27, 2025, Plaintiff sent a formal email to Dr. Amy Rapaport, Molly Menton, Heather Karpey, NP, Janice Tam (Legal Department), Candace Kohl Dale (Senior Vice President of Care Operations), and Emilee Rojas (Senior Medical Services Manager) titled "Adjustment to Credentialing and Patient Intake Capacity." In this email, Plaintiff described the illegality and liability of Defendant Equip's licensing model and the dangers of removing patient screening criteria that had previously protected both providers and patients.

h. On or about April 3, 2025, Plaintiff raised concerns to Heather Karpey about retaliatory treatment he was experiencing, including a dramatic increase in his patient caseload from 37 transferred patients to 65 transferred patients, plus nine brand new patients assigned in a single day.

i. On or about April 10, 2025, Plaintiff raised patient safety concerns to Maria La Via, MD, Defendant Equip's backup supervising physician, regarding the treatment of medically complex patients.

129. Throughout the period from November 2024 through April 2025, Plaintiff repeatedly disclosed to Defendant Equip's supervisors, compliance personnel, and legal department his reasonable belief that Defendant Equip was violating state medical licensing statutes, including but not limited to provisions of the Illinois Medical Practice Act (225 ILCS 60/), the Illinois Telehealth Act (225 ILCS 150/), Illinois administrative regulations governing telehealth (89 Ill. Adm. Code 140.403), and analogous statutes and regulations in other states where Defendant Equip assigned Plaintiff to treat patients without proper licensure.

130. Plaintiff's disclosures were protected under California Labor Code Section 1102.5(b) because: (i) he disclosed information to persons with authority over him, including his direct supervisors Dr. Amy Rapaport and Heather Karpey, NP, and to other employees who had authority

to investigate, discover, or correct the violations, including Molly Menton (VP of Quality and Compliance), Janice Tam (Legal Department), and Candace Kohl Dale (Senior VP of Care Operations); (ii) he had reasonable cause to believe that the information disclosed violations of state and federal statutes governing medical licensure and telehealth practice; and (iii) he had reasonable cause to believe that the information disclosed violations of or noncompliance with state and federal rules and regulations governing medical practice and patient safety.

131. Defendant Equip had actual knowledge of Plaintiff's protected disclosures because Plaintiff made the disclosures directly to Defendant Equip's supervisors, compliance officers, and legal personnel, including but not limited to: Amy Rapaport, MD (Supervising Physician); Heather Karpey, NP (Supervisor); Molly Menton (VP of Quality and Compliance); Janice Tam (Legal Department); Candace Kohl Dale (Senior VP of Care Operations); and Emilee Rojas (Senior Medical Services Manager).

132. Following Plaintiff's protected disclosures and because of those disclosures, Defendant Equip retaliated against Plaintiff through multiple adverse employment actions.

a. On or about March 27, 2025, immediately after Plaintiff sent his formal email regarding licensing violations and patient safety concerns, Defendant Equip doubled his workload by increasing the number of patients assigned to him in his licensed states.

b. On or about April 3, 2025, Plaintiff's patient transfers increased from 37 to 65, and he was assigned nine brand new patients in a single day, constituting a dramatic and retaliatory increase in workload imposed immediately after his March 27, 2025 protected disclosure.

c. Between March 2025 and April 2025, Defendant Equip assigned Plaintiff five additional state licenses without consultation or discussion, thereby increasing his administrative burdens and licensing costs in retaliation for his protected complaints.

d. Following Plaintiff's protected disclosures, Dr. Amy Rapaport ceased responding to Plaintiff's emails and communications, thereby isolating him and impeding his ability to perform his job duties and obtain necessary supervisory support.

e. Dr. Amy Rapaport failed to complete licensing forms required for Plaintiff to obtain his Mississippi medical license, which failure was directly retaliatory and resulted in

Plaintiff losing his pending Mississippi license application, thereby materially impairing his ability to achieve his annual review goals, which were tied to licensing metrics.

f. During the week of March 24, 2025, immediately following Plaintiff's protected disclosures, Defendant Equip scheduled ten intake appointments for Plaintiff, including seven intakes during a week when Plaintiff was scheduled to be on paid time off, thereby interfering with his approved leave and increasing his workload in a retaliatory manner.

g. Between February 2025 and April 2025, Defendant Equip repeatedly scheduled intake appointments for Plaintiff in time slots designated for follow-up care, thereby reducing his ability to provide continuity of care to existing patients and degrading the quality of care he could provide, all in retaliation for his protected disclosures.

h. On or about April 3, 2025, when Plaintiff complained to Heather Karpey about the retaliatory increase in his workload, Ms. Karpey dismissed his complaints without investigation or action, thereby ratifying and continuing the retaliatory conduct.

133. The retaliatory actions taken by Defendant Equip were directly and proximately caused by Plaintiff's protected disclosures under California Labor Code Section 1102.5(b). The temporal proximity between Plaintiff's disclosures and Defendant Equip's adverse actions, combined with the lack of any legitimate non-retaliatory explanation for the sudden and dramatic changes to Plaintiff's working conditions, establishes that Defendant Equip's actions were taken in retaliation for Plaintiff's protected activity.

134. As a direct and proximate result of Defendant Equip's retaliatory conduct, Plaintiff suffered damages including but not limited to: lost wages and benefits; loss of professional opportunities and career advancement; emotional distress, anxiety, and mental anguish; displacement from his residence, requiring him to move out of his condominium and reside with his parents; the necessity of accepting undesirable employment positions; vehicle loss resulting from the commuting demands of such positions, which caused his car to break down beyond repair and require disposal; and an overwhelming post-traumatic stress response that has caused Plaintiff to lose trust and faith in organizational leadership, impairing his ability to pursue and obtain new employment.

135. Plaintiff is entitled to recover all damages available under California Labor Code Section 1102.5(b), including compensatory damages, punitive damages, and reasonable attorney's fees and costs pursuant to California Labor Code Section 1102.5(f).

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant Equip on Count I and award him the following relief:

A. Compensatory damages in an amount to be proven at trial;
B. Punitive damages in an amount to be proven at trial;
C. Reasonable attorney's fees and costs pursuant to California Labor Code Section 1102.5(f);
D. Pre-judgment and post-judgment interest as allowed by law;
E. Such other and further relief as this Court deems just and proper.

## COUNT II
## RETALIATION IN VIOLATION OF THE ILLINOIS WHISTLEBLOWER ACT
## (Against Defendant Equip Health Medical P.C.)
## (Pled in the Alternative to Count I)

136. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

137. This Count is pled in the alternative to Count I pursuant to Federal Rule of Civil Procedure 8(d)(2).

138. At all times relevant to this Count, Defendant Equip Health Medical P.C. was an "employer" within the meaning of the Illinois Whistleblower Act, 740 ILCS 174/5.

139. At all times relevant to this Count, Plaintiff Vincent Macino was an "employee" of Defendant Equip Health Medical P.C. within the meaning of the Illinois Whistleblower Act, 740 ILCS 174/5.

140. The Illinois Whistleblower Act, 740 ILCS 174/15(c), provides that "[a]n employer may not take retaliatory action against an employee for disclosing or threatening to disclose to any supervisor, principal officer, board member, or supervisor in an organization that has a contractual relationship with the employer who makes the employer aware of the disclosure, information related

to an activity, policy, or practice of the employer if the employee has a good faith belief that the activity, policy, or practice (i) violates a State or federal law, rule, or regulation or (ii) poses a substantial and specific danger to employees, public health, or safety."

141. By virtue of Section 174/15(c), Defendant Equip Health Medical P.C. owed Plaintiff a statutory duty not to retaliate against him for disclosing information to supervisors, principal officers, or board members regarding activities, policies, or practices of the employer when Plaintiff had a good faith belief that such activities, policies, or practices violated state or federal law, rules, or regulations, or posed a substantial and specific danger to employees, public health, or safety.

142. Beginning in or around November 2024 and continuing through April 30, 2025, Plaintiff made multiple protected disclosures to Defendant Equip Health Medical P.C.'s supervisors, principal officers, compliance personnel, and legal department regarding activities, policies, and practices that Plaintiff had a good faith belief violated state and federal law and posed substantial and specific dangers to public health and safety.

a. On or about October 15, 2024, during his orientation period, Plaintiff discovered that Defendant Equip Health Medical P.C. had assigned him patients located in states where he was not licensed to practice medicine, in violation of state medical practice acts and telehealth licensure requirements. Plaintiff raised these concerns to his supervisor, Heather Karpey, NP, and to his supervising physician, Amy Rapaport, MD.

b. In or around November 2024, Plaintiff disclosed to Molly Menton, Vice President of Quality and Compliance, that Defendant Equip Health Medical P.C. was assigning him to treat patients in states where he was not licensed, in violation of state medical licensing laws and patient safety standards. Plaintiff informed Ms. Menton that he had contacted state licensing boards, including the Minnesota Board of Medical Practice, to inquire about the legality of these practices.

c. On or about October 23, 2024, Plaintiff received guidance from the Minnesota Board of Medical Practice via email stating: "Until you have an active medical license, the physician would need to see the patient as well. It isn't enough for them just to attest the documentation." Plaintiff forwarded this guidance to Defendant Equip Health Medical P.C.'s leadership and legal department.

d. On or about March 26, 2025, during a Med/Psych team meeting attended by Janice Tam from Defendant Equip Health Medical P.C.'s Legal Department, Plaintiff again

raised concerns about the legality of practicing in states where he was not fully licensed. Ms. Tam requested that Plaintiff follow up with her by email, which he did on March 26, 2025.

e. On or about March 20, 2025, Plaintiff raised concerns to Dr. Amy Rapaport about licensure issues and the removal of pre-screening criteria for high-risk patients, which created patient safety risks and exposed providers to liability.

f. On or about March 25, 2025, Plaintiff emailed Kelly Watton, NP, voicing concerns about being pressured to treat patients in states where he was unlicensed and the ethical risks of admitting severely ill patients into a care model unequipped to support them.

g. On or about March 27, 2025, Plaintiff sent a formal email to Dr. Amy Rapaport, Molly Menton, Heather Karpey, NP, Janice Tam (Legal Department), Candace Kohl Dale (Senior Vice President of Care Operations), and Emilee Rojas (Senior Medical Services Manager) titled "Adjustment to Credentialing and Patient Intake Capacity." In this email, Plaintiff described the illegality and liability of Defendant Equip Health Medical P.C.'s licensing model and the dangers of removing patient screening criteria that had previously protected both providers and patients.

h. On or about April 3, 2025, Plaintiff raised concerns to Heather Karpey about retaliatory treatment he was experiencing, including a dramatic increase in his patient caseload from 37 transferred patients to 65 transferred patients, plus nine brand new patients assigned in a single day.

i. On or about April 10, 2025, Plaintiff raised patient safety concerns to Maria La Via, MD, Defendant Equip Health Medical P.C.'s backup supervising physician, regarding the treatment of medically complex patients.

j. Throughout the period from November 2024 through April 2025, Plaintiff repeatedly disclosed to Defendant Equip Health Medical P.C.'s supervisors, principal officers, compliance personnel, and legal department information related to activities, policies, and practices of Defendant Equip Health Medical P.C. that Plaintiff had a good faith belief violated state and federal laws, rules, and regulations, and posed substantial and specific dangers to public health and safety.

143. Plaintiff had a good faith belief that Defendant Equip Health Medical P.C.'s activities, policies, and practices violated state medical licensing statutes, including but not limited to provisions of the Illinois Medical Practice Act (225 ILCS 60/), the Illinois Telehealth Act (225 ILCS 150/10), Illinois administrative regulations governing telehealth (89 Ill. Adm. Code 140.403(b)(1)(B)), and analogous statutes and regulations in other states where Defendant Equip Health Medical P.C. assigned Plaintiff to treat patients without proper licensure.

144. Plaintiff had a good faith belief that Defendant Equip Health Medical P.C.'s activities, policies, and practices posed a substantial and specific danger to public health and safety by requiring medical providers to treat patients in states where the providers were not licensed, by removing pre-screening criteria for high-risk patients, and by admitting severely ill patients into a care model that was not equipped to provide appropriate levels of care for such patients.

145. Plaintiff's disclosures were protected under the Illinois Whistleblower Act, 740 ILCS 174/15(c), because: (i) he disclosed information to supervisors and principal officers of Defendant Equip Health Medical P.C., including his direct supervisors Dr. Amy Rapaport and Heather Karpey, NP, and to other supervisors and principal officers including Molly Menton (VP of Quality and Compliance), Janice Tam (Legal Department), Candace Kohl Dale (Senior VP of Care Operations), and Emilee Rojas (Senior Medical Services Manager); (ii) the information disclosed related to activities, policies, and practices of Defendant Equip Health Medical P.C.; (iii) Plaintiff had a good faith belief that the activities, policies, and practices violated state and federal laws, rules, and regulations governing medical licensure and telehealth practice; and (iv) Plaintiff had a good faith belief that the activities, policies, and practices posed a substantial and specific danger to public health and safety.

146. Defendant Equip Health Medical P.C. had actual knowledge of Plaintiff's protected disclosures because Plaintiff made the disclosures directly to Defendant Equip Health Medical P.C.'s supervisors, principal officers, compliance officers, and legal personnel, including but not limited to: Amy Rapaport, MD (Supervising Physician); Heather Karpey, NP (Supervisor); Molly Menton (VP of Quality and Compliance); Janice Tam (Legal Department); Candace Kohl Dale (Senior VP of Care Operations); and Emilee Rojas (Senior Medical Services Manager).

147. Following Plaintiff's protected disclosures and because of those disclosures, Defendant Equip Health Medical P.C. retaliated against Plaintiff through multiple adverse employment actions.

a. On or about March 27, 2025, immediately after Plaintiff sent his formal email regarding licensing violations and patient safety concerns, Defendant Equip Health Medical P.C. doubled his workload by increasing the number of patients assigned to him in his licensed states.

b. On or about April 3, 2025, Plaintiff's patient transfers increased from 37 to 65, and he was assigned nine brand new patients in a single day, constituting a dramatic and retaliatory increase in workload imposed immediately after his March 27, 2025 protected disclosure.

c. Between March 2025 and April 2025, Defendant Equip Health Medical P.C. assigned Plaintiff five additional state licenses without consultation or discussion, thereby increasing his administrative burdens and licensing costs in retaliation for his protected complaints.

d. Following Plaintiff's protected disclosures, Dr. Amy Rapaport ceased responding to Plaintiff's emails and communications, thereby isolating him and impeding his ability to perform his job duties and obtain necessary supervisory support.

e. Dr. Amy Rapaport failed to complete licensing forms required for Plaintiff to obtain his Mississippi medical license, which failure was directly retaliatory and resulted in Plaintiff losing his pending Mississippi license application, thereby materially impairing his ability to achieve his annual review goals, which were tied to licensing metrics.

f. During the week of March 24, 2025, immediately following Plaintiff's protected disclosures, Defendant Equip Health Medical P.C. scheduled ten intake appointments for Plaintiff, including seven intakes during a week when Plaintiff was scheduled to be on paid time off, thereby interfering with his approved leave and increasing his workload in a retaliatory manner.

g. Between February 2025 and April 2025, Defendant Equip Health Medical P.C. repeatedly scheduled intake appointments for Plaintiff in time slots designated for follow-up care, thereby reducing his ability to provide continuity of care to existing patients and degrading the quality of care he could provide, all in retaliation for his protected disclosures.

h. On or about April 3, 2025, when Plaintiff complained to Heather Karpey about the retaliatory increase in his workload, Ms. Karpey dismissed his complaints without investigation or action, thereby ratifying and continuing the retaliatory conduct..

148. Pursuant to 740 ILCS 174/20(c), Plaintiff is entitled to recover a civil penalty not to exceed $10,000.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant Equip Health Medical P.C. on Count II and award him the following relief:

A. Compensatory damages for emotional distress, mental anguish, and damage to professional reputation in an amount to be proven at trial;
B. A civil penalty not to exceed $10,000 pursuant to 740 ILCS 174/20(c);
C. Reasonable attorney's fees and costs pursuant to 740 ILCS 174/20;
D. Pre-judgment and post-judgment interest as allowed by law;
E. Such other and further relief as this Court deems just and proper.

## COUNT III
## RETALIATION IN VIOLATION OF THE ILLINOIS WHISTLEBLOWER ACT
## (Against Defendant Equip Health Medical Colorado P.C.)

149. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

150. At all times relevant to this Count, Defendant Equip Health Medical Colorado P.C. was an "employer" within the meaning of the Illinois Whistleblower Act, 740 ILCS 174/5.

151. At all times relevant to this Count, Plaintiff Vincent Macino was an "employee" of Defendant Equip Health Medical Colorado P.C. within the meaning of the Illinois Whistleblower Act, 740 ILCS 174/5.

152. Plaintiff's employment with Defendant Equip Health Medical Colorado P.C. commenced on or about May 1, 2025, and continued through his unlawful termination on July 9, 2025.

153. The Illinois Whistleblower Act, 740 ILCS 174/15(c), provides that "[a]n employer may not take retaliatory action against an employee for disclosing or threatening to disclose to any supervisor, principal officer, board member, or supervisor in an organization that has a contractual relationship with the employer who makes the employer aware of the disclosure, information related to an activity, policy, or practice of the employer if the employee has a good faith belief that the activity, policy, or practice (i) violates a State or federal law, rule, or regulation or (ii) poses a substantial and specific danger to employees, public health, or safety."

154. By virtue of Section 174/15(c), Defendant Equip Health Medical Colorado P.C. owed Plaintiff a statutory duty not to retaliate against him for disclosing information to supervisors, principal officers, or board members regarding activities, policies, or practices of the employer when Plaintiff had a good faith belief that such activities, policies, or practices violated state or federal law, rules, or regulations, or posed a substantial and specific danger to employees, public health, or safety.

155. Prior to his employment with Defendant Equip Health Medical Colorado P.C., Plaintiff was employed by Defendant Equip Health Medical P.C. from approximately October 15 2024, through April 30, 2025.

156. During his employment with Defendant Equip Health Medical P.C., Plaintiff made multiple protected disclosures regarding activities, policies, and practices that Plaintiff had a good faith belief violated state and federal law and posed substantial and specific dangers to public health and safety, as set forth in detail in Count II of this Complaint.

157. Defendant Equip Health Medical Colorado P.C. had actual knowledge of Plaintiff's prior protected disclosures made during his employment with Defendant Equip Health Medical P.C. because Defendant Equip Health Medical Colorado P.C. and Defendant Equip Health Medical P.C. are related entities operating under common control and management, sharing supervisory personnel, human resources personnel, compliance personnel, legal personnel, and operational systems.

158. Defendant Equip Health Medical Colorado P.C. had actual knowledge of Plaintiff's prior protected disclosures because the same supervisors, principal officers, compliance personnel, and legal personnel to whom Plaintiff made his protected disclosures during his employment with Defendant Equip Health Medical P.C. continued to supervise, direct, and manage Plaintiff's employment with Defendant Equip Health Medical Colorado P.C., including but not limited to: Amy Rapaport, MD (Supervising Physician); Heather Karpey, NP (Supervisor); Molly Menton (VP of Quality and Compliance); Janice Tam (Legal Department); Candace Kohl Dale (Senior VP of Care

Operations); Emilee Rojas (Senior Medical Services Manager); Andy Meyers (Manager of People Success); Alex Hershiser (People Operations Manager); and Brooke Harris (Senior Director of People Success).

159. During his employment with Defendant Equip Health Medical Colorado P.C. from May 1, 2025 through July 9, 2025, Plaintiff continued to make protected disclosures regarding activities, policies, and practices that Plaintiff had a good faith belief violated state and federal law and posed substantial and specific dangers to patient health and safety.

> a. On or about May 8, 2025, Dr. Amy Rapaport issued a verbal coaching to Plaintiff warning him not to express dissent or any "negative" feedback in team meetings, Slack messages, or patient charts, even when patients were medically inappropriate for Defendant Equip Health Medical Colorado P.C.'s level of care. Dr. Rapaport specifically told Plaintiff that he should not say anything negative or opposing Defendant Equip Health Medical Colorado P.C.'s model in any team huddles or in patients' charts, including expressing views that a patient should be in a higher level of care and not admitted with Defendant Equip Health Medical Colorado P.C. due to medical risk or morbidity and mortality. Dr. Rapaport stated that Defendant Equip Health Medical Colorado P.C.'s mission would not change and that Plaintiff should raise concerns only in one-on-one evaluations with supervisors for any views that were not one hundred percent aligned with Defendant Equip Health Medical Colorado P.C.'s values.
>
> b. Following this coaching, Plaintiff engaged in protected activity by sending a follow-up email to Dr. Rapaport requesting that she reply to him with a written summary of what she had said for clarification and to allow him to ask follow-up questions. This request for written documentation of the restriction on his ability to advocate for patient safety constituted protected activity under the Illinois Whistleblower Act because Plaintiff was challenging and seeking clarification of a policy that he had a good faith belief suppressed disclosures of violations of law and substantial and specific dangers to patient health and safety.
>
> c. On or about May 19, 2025, Plaintiff resurfaced concerns regarding credentialing tasks that Dr. Rapaport had failed to complete, which failure continued to impede Plaintiff's ability to obtain necessary state medical licenses and to fulfill his job responsibilities. Plaintiff's continued advocacy for proper credentialing and licensure compliance constituted protected activity under the Illinois Whistleblower Act.
>
> d. On or about June 12, 2025, Plaintiff spoke with Alex Hershiser, People Operations Manager, about concerns that he was being retaliated against for his prior protected disclosures regarding licensing violations and patient safety concerns. Plaintiff's disclosure of retaliation to human resources personnel constituted protected activity under the Illinois Whistleblower Act.

e. On or about July 3, 2025, Plaintiff met with Andy Meyers, Manager of People Success, to formally report that he was being retaliated against for refusing to treat patients in states where he was unlicensed, for objecting to the deterioration in patient safety standards, and for expressing concerns regarding Dr. Rapaport's behavior. Plaintiff reiterated the ethical and legal issues stemming from Defendant Equip Health Medical Colorado P.C.'s removal of intake screening criteria and noted that the excessive intake load had eroded his ability to provide follow-up care to patients. Plaintiff specifically requested that Mr. Meyers send him an email with a summary of what they discussed so that Plaintiff could understand what Mr. Meyers took away from the conversation and so they could schedule follow-up meetings to address the issues and build a path forward with improved communication and working conditions. Plaintiff's formal report of retaliation and of ongoing violations of law and dangers to public health and safety constituted protected activity under the Illinois Whistleblower Act.

f. On or about July 3, 2025, Plaintiff also emailed Heather Karpey about how the overload of intake appointments interfered with care quality and patient safety. Plaintiff's disclosure regarding the impact of excessive intakes on patient care constituted protected activity under the Illinois Whistleblower Act.

160. Throughout the period from May 1, 2025 through July 9, 2025, Plaintiff repeatedly disclosed to Defendant Equip Health Medical Colorado P.C.'s supervisors, principal officers, and human resources personnel information related to activities, policies, and practices of Defendant Equip Health Medical Colorado P.C. that Plaintiff had a good faith belief violated state and federal laws, rules, and regulations, and posed substantial and specific dangers to public health and safety.

161. Plaintiff had a good faith belief that Defendant Equip Health Medical Colorado P.C.'s activities, policies, and practices violated state medical licensing statutes, including but not limited to provisions of the Illinois Medical Practice Act (225 ILCS 60/), the Illinois Telehealth Act (225 ILCS 150/10), Illinois administrative regulations governing telehealth (89 Ill. Adm. Code 140.403(b)(1)(B)), and analogous statutes and regulations in other states where Defendant Equip Health Medical Colorado P.C. assigned Plaintiff to treat patients without proper licensure, as he was required to comply with Illinois regulations in his practice as a condition of his Illinois P.A. license.

162. Plaintiff had a good faith belief that Defendant Equip Health Medical Colorado P.C.'s activities, policies, and practices posed a substantial and specific danger to public health and safety by requiring medical providers to treat patients in states where the providers were not licensed, by

removing pre-screening criteria for high-risk patients, by admitting severely ill patients into a care model that was not equipped to provide appropriate levels of care for such patients, and by suppressing provider advocacy for patient safety through policies that prohibited providers from expressing concerns about patient appropriateness for the level of care provided.

163. Plaintiff's disclosures were protected under the Illinois Whistleblower Act, 740 ILCS 174/15(c), because: (i) he disclosed information to supervisors, principal officers, and human resources personnel of Defendant Equip Health Medical Colorado P.C., including his direct supervisors Dr. Amy Rapaport and Heather Karpey, NP, and to other supervisors, principal officers, and human resources personnel including Andy Meyers (Manager of People Success) and Alex Hershiser (People Operations Manager); (ii) the information disclosed related to activities, policies, and practices of Defendant Equip Health Medical Colorado P.C.; (iii) Plaintiff had a good faith belief that the activities, policies, and practices violated state and federal laws, rules, and regulations governing medical licensure and telehealth practice; and (iv) Plaintiff had a good faith belief that the activities, policies, and practices posed a substantial and specific danger to public health and safety.

164. Defendant Equip Health Medical Colorado P.C. had actual knowledge of Plaintiff's protected disclosures made during his employment with Defendant Equip Health Medical Colorado P.C. because Plaintiff made the disclosures directly to Defendant Equip Health Medical Colorado P.C.'s supervisors, principal officers, and human resources personnel, including but not limited to: Amy Rapaport, MD (Supervising Physician); Heather Karpey, NP (Supervisor); Andy Meyers (Manager of People Success); and Alex Hershiser (People Operations Manager).

165. Following Plaintiff's protected disclosures, and because of both his prior protected disclosures made during his employment with Defendant Equip Health Medical P.C. and his continued protected disclosures during his employment with Defendant Equip Health Medical

Colorado P.C., Defendant Equip Health Medical Colorado P.C. retaliated against Plaintiff through multiple adverse employment actions.

a. On or about May 8, 2025, Dr. Amy Rapaport issued a coaching to Plaintiff that constituted an adverse employment action by warning Plaintiff not to express dissent or concerns about patient safety in team meetings, on Slack, or in patient charts, thereby attempting to suppress Plaintiff's ability to engage in protected whistleblowing activity. When Plaintiff requested written confirmation of this coaching, Dr. Rapaport refused to provide the written documentation and omitted from her written response the restrictions she had clearly articulated verbally, demonstrating consciousness of wrongdoing.

b. Following Plaintiff's protected disclosures, Dr. Amy Rapaport continued to cease responding to Plaintiff's emails and communications, thereby isolating him and impeding his ability to perform his job duties and obtain necessary supervisory support.

c. Dr. Amy Rapaport continued to fail to complete licensing forms required for Plaintiff to obtain necessary state medical licenses, which failure was directly retaliatory and resulted in Plaintiff losing his pending Mississippi license application and being unable to complete licensure in Texas and Arkansas, thereby materially impairing his ability to achieve his annual review goals, which were tied to licensing metrics and affected his eligibility for bonuses.

d. Throughout May, June, and July 2025, Defendant Equip Health Medical Colorado P.C. continued to schedule excessive intake appointments for Plaintiff, including scheduling intake appointments in time slots designated for follow-up care, thereby reducing his ability to provide continuity of care to existing patients, degrading the quality of care he could provide, and increasing his workload in a retaliatory manner.

e. Following Plaintiff's formal report of retaliation to Andy Meyers on July 3, 2025, Mr. Meyers failed to follow up with Plaintiff, failed to send the requested written summary of their conversation, failed to schedule follow-up meetings, and failed to take any action to investigate or remedy the retaliation, thereby ratifying and continuing the retaliatory conduct.

f. On or about July 9, 2025, just six days after Plaintiff's formal report of retaliation to Andy Meyers, Defendant Equip Health Medical Colorado P.C. terminated Plaintiff's employment during a meeting with Brooke Harris, Senior Director of People Success, and Heather Karpey, NP.

166. The retaliatory actions taken by Defendant Equip Health Medical Colorado P.C., including the coaching, the continued failure to provide supervisory support, the continued excessive workload, the failure to investigate Plaintiff's retaliation complaints, and the ultimate termination of

his employment, were directly and proximately caused by Plaintiff's protected disclosures under the Illinois Whistleblower Act.

167. The retaliatory actions were directly and proximately caused both by Plaintiff's prior protected disclosures made during his employment with Defendant Equip Health Medical P.C., of which Defendant Equip Health Medical Colorado P.C. had actual knowledge, and by Plaintiff's continued protected disclosures during his employment with Defendant Equip Health Medical Colorado P.C.

168. As a direct and proximate result of Defendant Equip Health Medical Colorado P.C.'s retaliatory conduct, Plaintiff suffered damages including but not limited to: lost wages and benefits; loss of the opportunity to earn a fifteen percent bonus on his base salary of one hundred thirty thousand dollars; loss of professional opportunities and career advancement; loss of health insurance and other employment benefits; severe emotional distress, anxiety, and mental anguish; humiliation and damage to his professional reputation.

169. Plaintiff is entitled to recover all damages and remedies available under the Illinois Whistleblower Act, 740 ILCS 174/20, including: (i) compensation for lost wages, benefits, and other remuneration; (ii) compensatory damages; (iii) payment of reasonable costs and attorney's fees; and (iv) all other relief as may be necessary to make Plaintiff whole.

170. Pursuant to 740 ILCS 174/20(c), Plaintiff is entitled to recover a civil penalty not to exceed $10,000.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant Equip Health Medical Colorado P.C. on Count III and award him the following relief:

A. Compensation for lost wages, benefits, and other remuneration in an amount to be proven at trial;
B. Compensatory damages for emotional distress, mental anguish, humiliation, and damage to professional reputation in an amount to be proven at trial;

C. A civil penalty not to exceed $10,000 pursuant to 740 ILCS 174/20(c);
D. Reasonable attorney's fees and costs pursuant to 740 ILCS 174/20;
E. Pre-judgment and post-judgment interest as allowed by law;
F. Such other and further relief as this Court deems just and proper.

## COUNT IV
## RETALIATORY DISCHARGE IN VIOLATION OF ILLINOIS COMMON LAW
## (Against Defendant Equip Health Medical Colorado P.C.)

171. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

172. Plaintiff's employment with Defendant Equip Health Medical Colorado P.C. commenced on or about May 1, 2025, and continued through his unlawful termination on July 9, 2025.

173. Prior to his employment with Defendant Equip Health Medical Colorado P.C., Plaintiff was employed by Defendant Equip Health Medical P.C. from approximately October 15, 2024, through April 30, 2025.

174. During his employment with Defendant Equip Health Medical P.C., Plaintiff made multiple complaints to supervisors, principal officers, compliance personnel, and legal department regarding activities, policies, and practices that Plaintiff reasonably believed violated state and federal law and regulations.

175. In or around November 2024, Plaintiff complained to Molly Menton, Vice President of Quality and Compliance, that Defendant Equip Health Medical P.C. was assigning him to treat patients in states where he was not licensed, in violation of state medical licensing laws. Plaintiff informed Ms. Menton that he had contacted state licensing boards, including the Minnesota Board of Medical Practice, which had advised him that treating patients without proper licensure violated state law.

176. On or about October 23, 2024, Plaintiff received guidance from the Minnesota Board of Medical Practice via email stating: "Until you have an active medical license, the physician would need to see the patient as well. It isn't enough for them just to attest the documentation." Plaintiff forwarded this guidance to Defendant Equip Health Medical P.C.'s leadership and legal department.

177. On or about March 26, 2025, during a Med/Psych team meeting attended by Janice Tam from Defendant Equip Health Medical P.C.'s Legal Department, Plaintiff complained about the legality of practicing in states where he was not fully licensed. Ms. Tam requested that Plaintiff follow up with her by email, which he did on March 26, 2025.

178. On or about March 27, 2025, Plaintiff sent a formal email to Dr. Amy Rapaport, Molly Menton, Heather Karpey, NP, Janice Tam (Legal Department), Candace Kohl Dale (Senior Vice President of Care Operations), and Emilee Rojas (Senior Medical Services Manager) titled "Adjustment to Credentialing and Patient Intake Capacity." In this email, Plaintiff described what he reasonably believed to be the violations of law and regulations related to of Defendant Equip Health Medical P.C.'s licensing model and the dangers of removing patient screening criteria that had previously protected both providers and patients.

179. Throughout the period from November 2024 through April 2025, Plaintiff repeatedly complained to Defendant Equip Health Medical P.C.'s supervisors, principal officers, compliance personnel, and legal department that the company's practices of requiring providers to treat patients in states where they were not licensed violated state medical licensing statutes, including but not limited to provisions of the Illinois Medical Practice Act (225 ILCS 60/), the Illinois Telehealth Act (225 ILCS 150/10), and Illinois administrative regulations governing telehealth (89 Ill. Adm. Code 140.403(b)(1)(B)).

180. Plaintiff reasonably believed that these practices violated state laws and regulations that have the force and effect of law.

181. Defendant Equip Health Medical Colorado P.C. had actual knowledge of Plaintiff's complaints made during his employment with Defendant Equip Health Medical P.C. because Defendant Equip Health Medical Colorado P.C. and Defendant Equip Health Medical P.C. are related entities operating under common control and management, sharing supervisory personnel, human resources personnel, compliance personnel, legal personnel, and operational systems.

182. Defendant Equip Health Medical Colorado P.C. had actual knowledge of Plaintiff's complaints because the same supervisors, principal officers, compliance personnel, and legal personnel to whom Plaintiff made his complaints during his employment with Defendant Equip Health Medical P.C. continued to supervise, direct, and manage Plaintiff's employment with Defendant Equip Health Medical Colorado P.C., including but not limited to: Amy Rapaport, MD (Supervising Physician); Heather Karpey, NP (Supervisor); Molly Menton (VP of Quality and Compliance); Janice Tam (Legal Department); Candace Kohl Dale (Senior VP of Care Operations); Emilee Rojas (Senior Medical Services Manager); Andy Meyers (Manager of People Success); Alex Hershiser (People Operations Manager); and Brooke Harris (Senior Director of People Success).

183. During his employment with Defendant Equip Health Medical Colorado P.C. from May 1, 2025 through July 9, 2025, Plaintiff continued to complain about practices that he reasonably believed violated state and federal law and regulations.

184. On or about June 12, 2025, Plaintiff complained to Alex Hershiser, People Operations Manager, about concerns that he was being retaliated against for his prior complaints regarding licensing violations and patient safety concerns.

185. On or about July 3, 2025, Plaintiff met with Andy Meyers, Manager of People Success, to formally complain that he was being retaliated against for refusing to treat patients in states where he was unlicensed in violation of state licensing laws, for objecting to the removal of intake screening criteria, and for expressing concerns regarding Dr. Rapaport's behavior. Plaintiff reiterated the ethical

and legal issues stemming from Defendant Equip Health Medical Colorado P.C.'s removal of intake screening criteria and noted that the excessive intake load had eroded his ability to provide follow-up care to patients.

186. On or about July 3, 2025, Plaintiff also emailed Heather Karpey about how the overload of intake appointments interfered with care quality and patient safety.

187. Throughout the period from May 1, 2025 through July 9, 2025, Plaintiff repeatedly complained to Defendant Equip Health Medical Colorado P.C.'s supervisors, principal officers, and human resources personnel about activities, policies, and practices that Plaintiff reasonably believed violated state and federal laws and regulations.

188. Plaintiff reasonably believed that Defendant Equip Health Medical Colorado P.C.'s activities, policies, and practices violated state medical licensing statutes, including but not limited to provisions of the Illinois Medical Practice Act (225 ILCS 60/), the Illinois Telehealth Act (225 ILCS 150/10), Illinois administrative regulations governing telehealth (89 Ill. Adm. Code 140.403(b)(1)(B)), and analogous statutes and regulations in other states where Defendant Equip Health Medical Colorado P.C. assigned Plaintiff to treat patients without proper licensure.

189. On July 9, 2025, Defendant Equip Health Medical Colorado, P.C. terminated Plaintiff in retaliation for Plaintiff's complaints about activities, policies, and practices that Plaintiff reasonably believed violated state and federal laws and regulations.

190. Illinois recognizes a common law cause of action for retaliatory discharge when an employee is terminated in violation of a clear mandate of public policy.

191. The State of Illinois has a clear mandate of public policy, expressed in constitutional provisions, statutes, and administrative regulations having the force and effect of law, that medical providers must be properly licensed in the states where they treat patients and that providers must comply with state medical licensing laws and telehealth regulations.

192. The Illinois Medical Practice Act, 225 ILCS 60/, establishes licensing requirements for medical providers practicing in Illinois and prohibits the practice of medicine without a valid license.

193. The Illinois Telehealth Act, 225 ILCS 150/10, provides that "[a] health care professional treating a patient located in this State through telehealth services must be licensed or authorized to practice in Illinois."

194. Illinois administrative regulations, 89 Ill. Adm. Code 140.403(b)(1)(B), provide that "[t]he distant site provider must be ... licensed by the State of Illinois or by the state where the patient is located."

195. The Illinois Telehealth Act, 225 ILCS 150/15(a), provides that telehealth practice must be "consistent with the standards of care for in-person services," and cannot "authorize the delivery of health care services ... not otherwise authorized by the laws of this State."

196. These statutes and regulations express a clear mandate of public policy that medical providers must be properly licensed where they treat patients and that the provision of medical services in violation of licensing requirements is prohibited.

197. Plaintiff's complaints regarding Defendant Equip Health Medical Colorado P.C.'s practices of requiring providers to treat patients in states where they were not licensed implicated this clear mandate of public policy.

198. Defendant Equip Health Medical Colorado P.C. terminated Plaintiff's employment in retaliation for his complaints about practices that violated this clear mandate of public policy.

199. The termination of Plaintiff's employment in retaliation for his complaints about violations of state licensing laws and regulations violates the clear mandate of public policy expressed in Illinois statutes and administrative regulations.

200. As a direct and proximate result of Defendant Equip Health Medical Colorado P.C.'s retaliatory discharge of Plaintiff, Plaintiff suffered damages including but not limited to: lost wages

and benefits; loss of the opportunity to earn a fifteen percent bonus on his base salary of one hundred thirty thousand dollars; loss of professional opportunities and career advancement; loss of health insurance and other employment benefits; severe emotional distress, anxiety, and mental anguish; humiliation and damage to his professional reputation; and other economic and non-economic damages.

201. Defendant Equip Health Medical Colorado P.C.'s conduct in terminating Plaintiff in retaliation for his complaints about violations of law and regulations was willful, wanton, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant Equip Health Medical Colorado P.C. on Count IV and award him the following relief:

A. Compensatory damages in an amount to be proven at trial;
B. Punitive damages in an amount to be proven at trial;
C. Costs of suit;
D. Pre-judgment and post-judgment interest as allowed by law;
E. Such other and further relief as this Court deems just and proper.

Submitted by:
Counsel for Plaintiff
By: *__/s/ Nicholas J. Kreitman*

Nicholas Kreitman
Attorney ID 6318283
Kreitman Law, LLC
505 North La Salle Dr., Suite 500
Chicago, IL 60654
(847) 970-0575
njk@kreitmanlaw.com